Good morning, your honors. Paul Watford for defendant Richard Berger. I think I'll just address the arguments in the order that we brief them unless the court has a preference otherwise. Now let me start out with the count. I think we're supposed to start with 15 minutes on this one. Okay, there we go. Okay, yeah, let's have 15. So I'll start with loss causation. And I guess I'll start out by saying I'm a little bit surprised by the resistance the government has put up to our argument on loss causation because I, just putting aside precedent, the fact that the second and fifth circuits have already adopted the rule that we're asking the court to adopt, the fact that this court in Zolp has already at least implicitly suggested that loss causation principles apply. Now, maybe I shouldn't ask you, maybe I should ask the author of Zolp, what does that CF mean in front of Dura? Well, I don't have, we have the authority on that here. I know we do. I don't think it's just the CF side to Dura. I think it's more the explicit statement, and I don't have the case right in front of me, but if I recall the language, it was that what you have to do in trying to calculate actual loss is separate out those losses that were actually caused by the fraud from those losses that were caused by other market forces. That was the explicit statement that the court made there in Zolp. I'm not suggesting that the court has already held that civil loss causation principles apply in criminal cases. Counsel, what I'm troubled about, and I do know something about Zolp, correct me if I'm wrong. In this case, according to the findings of the prior fact, the fraud that was perpetrated began approximately a year before the public offering. Is that correct? No, that's not correct. Okay, correct me. What happened then? Vis-a-vis the public offering, when did the fraud commence? By that I mean, when were the financial statements impacted by the criminal actions of the defendant? The public offering was May of 1996. Okay. The specific counts of conviction that the jury rested its entire guilty verdict on went from false statements in April, April 30th of 1996 through December 31st of 1996. So that's an important issue from my perspective. So you're saying that the financial statements of the company that were used in connection with the S-1 were not in any way negatively impacted by fraud? No, I'm not saying that. Okay. If we got down into the weeds, there are very specific reasons why the particular fraud that the jury found Mr. Berger guilty of wouldn't have had a dramatic impact on the way the financial statements were presented because the company did not break down its inventory on the financial statements. And I understand that, but you're very well aware that when we get to sentencing, the court can look at something a little bit more than what the jury found here. And what I'm concerned about is that under Hicks, which, as you know, is our precedent, preceding Dura Pharmaceuticals, which is the civil case, although you can't have a fraud on the market theory in the direct sense, the fact is if there was a fraud that was perpetrated by the defendant and others by way of false financial statements that were included in the S-1, why would that not be considered, notwithstanding what the jury found? Let me just try to take one step back to put the argument that we're making in perspective because I don't think what we're suggesting here is radical at all. The guidelines basically give the government or the district court really three ways to find loss here. Actual loss, which, as Your Honor just mentioned, under Hicks, under the current version of the guidelines says loss is resulting from the fraudulent statement. If you can't show that, you can also rely on intended loss, right? Here the government didn't pursue that because there was no evidence that Mr. Berger ever intended for the shareholders to lose money. He was the largest shareholder himself after the IPO, and he lost everything when the company went down. If you can't show either actual loss or intended loss, you can show gain to the defendant. And again, the government didn't pursue that theory here because all of the IPO proceeds were used to pay down the bank debt. Mr. Berger sold maybe 300,000 shares in the IPO. He loaned that money to the company. The loan was never repaid when the company went under. Let me just back up a little bit so you can help me on this. Let's just say arguendo for just a moment. Let's assume that in period one the financial statements are falsely asserted because there was already a commencement of a fraud. There was an inflation of the assets. Okay? Are you with me so far? In period three, the S-1 is filed, including the S-X statements that include the inflated financial information based upon the falsity that started in period one. I'm with you. Okay. So then later on you've got the specific things that were alleged. You've got what the jury found and so on. Is it not logical that the government could rightly say that the defendant intended the bank and the purchasers of the stock to be injured by virtue of the fact that he knew from the get-go that the financials were inflated so that when the S-1 became effective and the stock was sold, people made their purchases, the underwriters made their evaluation based upon the falsely inflated values at that point? Is there something wrong with that theory? Not in theory, but there is something wrong with that as applied to this case. Okay. Help me with that. The government never pursued any intended loss theory ever. It was always only actual loss, and I want to get to why here there's no actual loss just as a matter of common sense. But the only thing I can say is that not only did the government not pursue that, but there was no evidence presented either at trial or at sentencing to support any notion that Mr. Berger intended for the public shareholders of the company to lose money. And I would just remind the Court again, he was the largest shareholder himself, so he didn't want any losses to the shareholders because that would impact him even more directly. He distinguished between the shareholders generally and those that put money in arguably after the false financial statements induced them to invest. He wasn't investing as a shareholder at that point. He was trying to keep the company alive. He may not have intended a loss, but that's the discrete group of the people whose new money went in that I'm particularly concerned about. Let me focus on why this loss causation principle is really just a matter of common sense. With a publicly traded company, in order for the shareholders to suffer an actual loss, three things have to be true. Number one, as Judge Smith, you just alluded to, the fraudulent statement has to inflate the share price. And I'm not contending that that didn't happen here. So we can see that there was some inflation as of the time of the IPO in May 1996. But second, there has to be a drop in the share price when that fraud is revealed to the market. I'm not sure. It seems to me if you've got what you've called inflation, I think it also could be characterized as an investment that otherwise would not have been made. Suppose you've got a company that's in fact underwater, but it doesn't reveal that. It issues financial statements. It induces people to invest a million dollars. The company fails. Why wouldn't that million dollars qualify as actual loss? All right. Well, let me be clear on this because I think Your Honor is talking about a different scenario. If you had a situation where the fraud caused the company to fall into bankruptcy. No, financial failure works for me. The thing is if the money wouldn't have been invested by the people because they didn't have the false financial statements to rely upon, the fact that the company failed anyway doesn't diminish the fact that they put in money they wouldn't have put in. But that's transaction causation. That's one component of causation. But there's also loss causation. And here we're focused on loss causation. I want you to explain to me why those people can't say, hey, I was duped to invest money I wouldn't have invested otherwise, and I don't have my million dollars back. Okay. Well, let me put it in these terms just again focusing on the facts of this case because it's crystal clear that none of those people lost money as a result of the fraud. Let's just start in January 1997. The share price was $3 a share. That's at the time of the IPO? No, it's a little bit after the IPO. What was the share price at the time of the IPO? $5.50. $5.50. So it had gone down, but I'm just focusing on January because the period where the greatest stock price decline occurred was in the spring of 1997. January 1997, it's at $3. In March, it goes down. In April, it goes down to $0.43 a share. Why was that? Because the company restated. You're not answering my question. Okay. Because my question has to focus on when the money came in. If I wouldn't have put the money in but for the false financial statements, the fact that the company later failed through business reasons doesn't change the fact that I wouldn't have put the money in but for the false statement. So the false statement induced an investment. I don't have the money anymore. I've lost because of that false statement. Well, Your Honor, you haven't lost money as a result of the fraud. I certainly have. If I wouldn't have put the money in but for the fraud, how can you say I would have lost that million dollars anyway if I wouldn't have put it in if it hadn't been for the fraud? The fact that the business subsequently failed for independent reason doesn't change the fact that I wouldn't have put the money in but for the fraud. Your Honor, let me try to explain it this way because I think you veered off, of course. If you put in a million dollars in May 1996 and the stock price goes down to a dollar in January of 1997 because of other events, and that's what happened here, because the company restated its earnings, because there was a failed joint venture in China, because the accountants issued a going concern letter, all of which had nothing to do with the fraud, which is exactly what the district court found here. Let me interject, if I may. I think that you and Judge Clifton are talking in two different universes. You're talking Dura. I mean, your definition of loss is the definition of loss in a private damages action as in Dura. Judge Clifton is talking, I'll call it this, common sense. I mean, what he says is true. Absent the fraudulent statement, they wouldn't have spent the money. If he hadn't lied to them, they would have invested somewhere else. They would have told him to go away. They would have done something that would have kept their million dollars. So in a commonsensical way, of course they've lost money as a result of the fraud. They did it directly in response to the fraud. My question to you is when we're talking not about private actions for recovery under the securities laws as in Dura, but rather we're talking about criminal punishment or restitution, not because of some private action but because we're now talking about something different. We're talking about someone who's done something bad, and we're talking about what should be the punishment for what he did bad. Why do we import that fairly narrow definition of loss from Dura? Okay. First of all, I don't think it's in there. I'm trying to figure out how you move from your position to or is there any bridge between your position and Judge Clifton's position? Well, I think Judge Clifton's question involves a scenario where, at least as I change the hypothetical, the shareholders would have lost their money anyway even if the fraud had not occurred. When that's true, you cannot say that. You say you can't say that. That's simply not true. Had the fraud not occurred, they would not have invested the money, period. They would have kept the money. Okay. First of all, there is no showing that that's a fact here, and I would submit to you that the government never pursued that theory because of that. Is that required? Well, I don't think it is. Actually, what Judge Clifton's saying is the very thing I was pursuing as well. We're looking at the same issue here, and also Judge Fletcher. Let's take your 550, the IPO price. Let's assume that had the underwriters known what the truth was, that the real price of those shares would have been 50 cents a share. Okay, just argument. Okay. So people put in an extra $5 a share, and it was suggested common sense would say they would never have invested it. In order to prove or in order to get the enhanced punishment under the law, is it required that the government show, prove, put in evidence to show specifically what it is that the real price would be, or is the very fact that it is known that there was false financial data used to do the IPO sufficient? The government has the burden of separating out, just as this Court said in Zoll, the losses that were attributable to the fraud and the losses that were attributable to other markets. But in this case, taking the hypothetical, if you take the 550 a share IPO, and if arguendo, the real value that an underwriter would have ascribed had the truth been known, 50 cents a share, there was an intended fraud of $5 a share, was there not? Your Honor, there was no intended loss here. The government has never. Can that not be imputed by the judge based upon the fact that there was false financial information used to do the IPO? No, not on these facts here. Why? Because Mr. Berger never intended for the shareholders to lose any money. The fraud that we're talking about here, the government charged fraud of this breadth. Wait a minute. Forgive me. You're saying that by putting in false financial information that in our hypothetical here, increased the value of the share offering by 10 times, that the government can't impute or the judge can't impute that there was an intent that a loss occur? I guess the only way I can explain it here is that there was no evidence whatsoever submitted by the government to show that price difference. So your, as I take it, your strongest point on this is that the government produced no evidence to provide anything on which this theory could be pursued and therefore it can't be used in sentencing. Yes. I'm saying that all of you are coming up with hypotheticals about different sets of facts in which those loss calculations might work. On these facts, though, the only theory the government ever pursued was actual loss based on the drop in the stock price. And that's, in fact, the way the district court came up with this $2.1 million loss figure, is that he tried to hypothesize what would have happened if the fraud had been revealed in the spring of 1997. How much would the stock have dropped? Right? That's how he came up with the 26.5 percent loss. Well, he's trying to figure out how much overpayment there is as a result of the fraudulent misrepresentation. Right. And he did that by looking at... Which is, I think, back to Judge Clifton. Had he told the truth, what would they have paid? Well, okay. And what I'm saying is that, just to be specific about the facts here, the fraud was in failing to accurately state the value of the B inventory on which the company could borrow money. The most that the company could borrow against the inventory at any one time was a million dollars off of a $50 million credit facility. So all I'm saying is that, okay, if that fraud had been revealed, Judge Smith, there would not have been a difference between $5.50 a share and $50. No, no, I just pulled that out of the air. Right. It was the concept I was talking about. Right. And I'm saying that the fraud that the jury actually convicted Mr. Berger of was not the kind of fraud, Judge Clifton, where you're talking about the company was actually worthless if you took away the fraudulent statement. This was a real company with real assets, real earnings. And yet, if there had been, if the underwriter had known that there was fraud, they would have never done the IPO in the first place, right? The government did. Probably, although Wall Street's been unusual these days. We disproved that at sentencing. The government did make that argument, Your Honor. We put in an expert declaration from Dr. Cornell who explained exactly how these kinds of things work. If there, in fact, is a problem with management in terms of the integrity of the financial numbers, and that's discovered before the offering, there are ways to correct that. You remove the management from having any responsibility for reporting of financial numbers, the offering can go forward, and corrective measures can be put in place. We put on an expert to refute that, and the district court accepted our theory. It did not go with the government's theory on that point. So, again, we're back to actual loss. And I would submit that even, Judge Clifton, under your hypothetical, there is no actual loss to the shareholders absent revelation of the fraud because if the stock is offered at $5.50 a share, right, and nothing comes out about the fraud. It's not worth $5.50 a share. Correct, correct. It's not worth $5.50 a share, but the stock price stays the same, right? Shareholder never sells the shares or if he or she does, sells it at $5.50 because there's been no revelation of the fraud. The stock hasn't dropped as a result. There's no actual loss. I would agree with you. That would be news to the person that doesn't have the million dollars anymore. They have a share that's still worth $5.50 a share. Not by the end of this scenario. The reason that the fraud doesn't have an impact is that the business fails on its own. The value has gone down to zero. So the investor has plainly lost. Correct. You're trying to say the loss has nothing to do with the fraud, and I think in many circumstances that's true. But when the original investment is tied to the fraud, I think there's a problem. Should we differentiate for purposes of our questioning here, and maybe even for purposes of Dura, between fraudulent misrepresentations for stock that's already on the market compared to fraudulent misrepresentations in connection with an IPO? I don't think it matters one bit because if there's no drop in the stock price after revelation of the fraud. I'm not sure that that's true. If you've just got something that's out there being exchanged on the open market, one private owner sells to another private owner through the exchange and so on, and the company is engaging in misleading or even fraudulent statements that keep the stock price up, the company's not making any money out of those private exchanges. Here, however, we have fraudulent behavior by the company that directly results in money coming into the company in an IPO, and the people are spending money that if they knew the truth, they would never spend. So does Dura even apply in this case? It absolutely does. But first of all, I just think the court is stuck on a fact. You're assuming a fact in this record that doesn't exist, which is this notion that if the fraud had been revealed, the IPO would have never gone forward, or these investors would have never invested their money. I'm not saying the IPO wouldn't have gone forward, but I am saying that a reasonable investor wouldn't have spent $5.50. They may not have. They may have only spent $5. Or they may have only spent $0.50. All I have to say, as soon as somebody says, you know, this guy lied to me, and instead of paying $5.50, I'll pay $2.50, that's not realistic. They say, you know what, I'm walking away. That's right. And I'm just saying that that's why we submitted expert evidence that showed when that kind of problem comes to light before the offering, there are corrective measures that can be taken. I've got to tell you, I've practiced transactions law for 37 years, and I have never seen an instance where there was fraud in the factum that the whole thing didn't just blow up. I mean, hypothetically, I suppose an expert could say it could be corrected, but as Judge Fletcher says, I mean, if there's a question about the integrity of the chief shareholder, CEO, and so on, I mean, it just goes poof. You know, I mean, it's just gone. Fair enough. I'm not going to dispute with Your Honor on that. All I would say, though, is that that's not the basis for the $2.1 million loss bonding that we're contesting here. You know what's happened here? We started out with 15 minutes. We now run you 20. Let's hear from the government, and then we'll give you a chance to respond. Okay. Thank you, Your Honor. Good morning. Tamara Phipps for the United States. Defendants' arguments, as I think the Court perceives, are entirely dependent upon Dura Pharmaceuticals, which was a case interpreting a civil statute. Defendants' arguments entirely sweep aside the guidelines provision that governs this loss and that was followed by the district court. The common sense questions that were coming from the court just now are entirely consistent with the district court's thinking, but the district court was applying 2F1.1, comment 7, sub A. But, counsel, even though that's what the guidelines say and the commentary of the guidelines say, isn't defense counsel correct that the government would still have the burden of putting somewhere in the record the bases upon which the district court would look at what the likely fraud was? In other words, there may be a penumbra, but you've got to put some air in the penumbra. Isn't that the government's burden? Well, certainly it is. Let me tell you. What did the government do to fill that penumbra? Well, the government tried several different approaches and ultimately the district court directed the government's approach. The district court announced in April of 2004, when it still expected to find investor loss back then, that it was, well, its approach was all of the loss that the district court found stemmed from the registration statement of May 16, 1996, that it immediately preceded the public offering. And the court viewed that as a fraudulent statement of value, a statement of overvalue of the offering. And that goes to the point that several of us were making, right? Yes. The other fraudulent statements that were counts of conviction are not the basis of the loss. It was just that one. And the court asked the government to back up from that. The court said, I'm not going to find 100 percent of the offering, of the amount of money raised in the offering, because the stock had some value. Where is this in the record, counsel? It's in the April 14, 2004 memorandum order. Do you know the ER on that or the SER? I may have it here someplace. I'm not absolutely sure. Just give me one second. Let's see. I'm sorry. I didn't note that. I have it over there, of course. It's in the ER. Maybe give us a 20HA letter and tell us where it is. April 27 order? April 14, I believe. The court asked the government to come up with something. It announced its formula. It rejected what the government and the PSR had originally proposed, which would have resulted in a much higher loss figure. And it said, what I want to do is measure overvaluation so as to follow 2F1.1, comment note 7A of the 1995 guidelines. And that comment, it says, fraud involving misrepresentation of the value of an item, loss is the difference between the amount paid by the victim and the actual value of the product. And that's what the court was trying to do. The court's formula was one that followed the suggestions in Judge Clifton's questions and in other questions here. This is what the court was trying to do. Ultimately, the proof that it took was the declaration of a financial analyst for the government that showed that the analyst had reviewed the declination in value of a number of stocks of other companies at the same time and ascertained that the diminution in value was about 26.5%. And so the court used that as the measure of overvaluation. But it was overvaluation. As of the time of the IPO. As of the time of the IPO. It was overvaluation that the court was shooting at following 2F1.1, which all of the defendant's arguments ignore. I have to say, I have difficulty understanding the logical connection between the process that led to that percentage and its application to the specific facts of this case and this company. There is no logical connection, is there, other than the assumption that maybe the drops would be the same? The assumption there is that the stock was overvalued when other similar stocks were overvalued and misconduct or fraud was revealed. They dropped about that much. And so 26.5% below the offering price was about the amount they were overvalued. Now, I understand. That talks later in the process. That really seems to me to reflect what happens if you hadn't had a business failure here such that the fraud might have been revealed at a time when there was still value in the stock. We're looking at the front end and trying to project. And I refer to the April 27 order because it looks to me like the same thing you're describing on record page 62. And the court says, okay, we'll take this 7.9 million figure. But the stock wasn't worthless. So you parties go figure out how much of it is an overstatement or what loss can flow from that. And the judge freely concedes that I'm not as familiar as you are as to how to do this. So he's looking for some help. And I understand the difficulty of this exercise. But I'm still puzzled as to how it is drops in other companies after fraud is revealed reflects what's the exaggeration in value at the time of the IPO for this company. I mean, I just don't see any real link between those two things. Well, you do understand exactly what the district court did. And if you go through the record, the government, well, the PSR and the government posited one way of doing this. Initially, we didn't, the initial suggestion by the PSR was not an overvaluation formula. It didn't follow the provision of two, the commentary of 2F1.1 that the district court used. It resulted in a much higher loss. The government came up in response to the April 27th, I guess it is, order. The government came up with two more formulas. But this is the one that the district court chose. Part of my confusion, I'm having, and maybe because there are just too many formulas floating in front of me, my sense in reading what he finally did, it sounds somewhat similar to the market capitalization approach that he said he was rejecting in this same April order. Is there a difference between them? Quite honestly, when I was first working through this, I thought to myself, what the court is doing is formulating what would have happened had the fraud been revealed, you know, which is the Dura formula. But it wasn't revealed, and so the court was doing it by analogy to other companies. But I must tell you that the record demonstrates that the court was attempting to approximate overvaluation. And we must remember in evaluating what the court did, the difficulty of establishing investor loss in general and the latitude that the court has under the guidelines. This isn't ---- Let me ask you this if I can. I'm trying to figure out the degree to which Dura should be applied in this context. And, of course, the other side is pushing very hard. The Dura has to be applied pretty much as Dura exists without much modification. I'm not sure I read either the Fifth Circuit or the Second Circuit quite saying that. Leonard, the second of the Second Circuit cases, says we look to it for guidance and so on. But also I'm trying to figure out if there should be any consequence attached to the fact that Dura is doing loss, even if I apply Dura strictly as Dura, when it's one private seller to another private seller, and the company's fraud keeps the stock price up, but the company itself is not the seller. Here, however, the company is the seller. So the company is selling something for $5.50 a share that it knows is not worth $5.50 a share, and the company is directly profiting. Should that mean that we don't apply the Dura analysis, even if this were an ordinary private recovery case? Well, yes, because the guidelines don't, that were in effect at the time. No, no, I'm a different question. Let's assume that we're in Dura land. That is to say, let's assume we're talking about private investor recovery and damages. But let's assume that instead of having the facts of Dura, which is to say company lies and the stock price stays up, and one private purchaser buying from a private seller overpays. But instead, Dura lies, and Dura itself sells the stock based upon a fraudulent misrepresentation. Because of the fraud, the stock sells at $10. If the statements in the fraud were retracted and only truthful statements were made, the stock, let's say, is worth $5.00. Now, does Dura tell us that you can't use that as a basis for recovery when the stock is being sold by the company itself? I'm not sure I can answer that question. Dura simply holds that. Dura is looking at a diminution in value. And the holding in Dura is the court failed to take into account other market factors. Dura is fraud on the market. Fraud on the market. And you're really talking here about a classic individual fraud case. I sell you this painting, which I tell you is a Rembrandt. It's not. You pay me $5 million. You discover it's a cheap copy. I say, well, it's got value, and my business is terrible, and people know that Rembrandt isn't very good after all, and so forth. All of that gets swept aside. You're rescinding the deal. I wouldn't have done the deal otherwise. And in an IPO situation, the question I'm not sure is asking, Dura doesn't address the IPO situation. Does that decision say anything about a direct fraud inducement of an individual purchase scenario? I don't believe so. I believe the only holding in Dura is that market factors have to be taken into account when assessing the degree to which the fraud caused the loss. I wonder if I could change our focus just for a moment to the standard, the evidentiary standard required by the district court. As you know, we've got the Harrison-Philpott line. We've got the Hooper line and the Jordan-Valencia line. Why doesn't the application of Jordan and Valencia indicate fairly clearly here that the district court should have applied a clear and convincing standard, given the really significant increase in the sentencing involved here? It really distorts what would otherwise be the guideline. I'm so glad you're asking me that. Me too. I hope I can present this with a little more clarity than I did in the brief. The short answer to your question is I don't think precedent allows it. Excuse me? I don't think precedent allows it. What precedent? The general rule is that preponderance is sufficient. I just mentioned these various cases, and unless you can correct me on this thing, I think the precedent is quite to the contrary. I mean Harrison-Philpott clearly does indicate that you have to tie it to the offense of conviction, but the Hooper line says that even if you have an offense of conviction, if the sentence enhancement has an extremely disproportionate impact, you've got to use clear and convincing evidence. Then Jordan and Valencia recognized there was a little bit of a tension there and went forward and set forth a six-factor test to winnow between these things. And do you suggest that Valencia and Jordan are not controlling law in this situation? No. Let me see if I can tell you what I think on this. Okay. First of all, we have to start early with McMillan. That said that preponderance was enough with respect to statutory minimums. This Court on Bonk in Restrepo took up the question of burden of proof with respect to guidelines enhancements, and in a case where the enhancement was not part of the offense, said we're bound by McMillan. Then came the Harris and Philpott line where repeatedly the Court held that preponderance was enough, addressing facts that were part of the offense of conviction or part of the conspiracy. And I agree with the defendant. There's no distinction there. Throughout, and this is terribly important, throughout, from McMillan on and all the way through what the defendant calls the Hooper line of cases, the concern is for an enhancement that's disproportionate relative to the offense. That language is in every single one of those cases. And I think for that reason, the Court early drew a line, conduct that is part, a factor that increases the sentence that's part of the offense cannot be disproportionate relative to the offense.  No matter how great. A hundred times. Well, no matter how great it is. That's how I interpret the Court's law. Always, always, all the way along, anticipating that there might be a case come along where an exception would be made, where a factor that's not part of the offense would increase the sentence in a manner that was disproportionate to the offense. Then we have the Hopper line of cases. And those cases, Hopper itself addresses conduct that's not part of the offense. That's acquitted conduct, two forms of acquitted conduct. The reply brief said it was part of the conspiracy, trying to make it look similar to this case. But I look back at Hopper, and the Court doesn't treat it as part of the conspiracy. The Hopper conspiracy was obstruction of the IRS, and the acquitted conduct was a violent assault on an IRS agent. And the Court treated it as it is not part of the offense in requiring clear and convincing proof. We have Mesa de Jesus, Munoz, Jordan, Stanton, all requiring clear and convincing evidence based on conduct that's not part of the offense. That's not true in all those cases. There are cases within that line where the charged offense was involved and that the Court found that a clear and convincing evidence standard was required. It's true of many of them, but it's not true of all of them. There's only one case in which the Court spoke of clear and convincing proof where the conduct was part of the offense, and that is Zolt. But the government had conceded... What do you make of Jordan as an attempt to try to reconcile these two somewhat conflicting lines of authority? I think the best way to reconcile the lines of authority is to say that if the conduct is part of the offense, preponderance is enough. And if it is not... That's not what Jordan said. Well, Jordan... Well, first of all, Valencia and Jordan do not set up a test. They have a six-part test, don't they? It is. If I look back... Looking at the totality of the circumstance. Well, totality... But they set out factors that they have seen the Court consider in prior cases. And Jordan, I think, specifically says that other factors might come into consideration. It's not really a test. It's got to be more than six factors. Well, it could be... You know, it's a totality-of-circumstances test. Now, Jordan is troubling in the sense that it doesn't treat part of the offense as dispositive. It doesn't refer... Well, it doesn't call it dispositive. It says it weighs heavily, but it ends up being dispositive in the result. So I do think the reasoning of Jordan is a little bit out of the general line, but I don't think the Court can set aside the prior line of cases. We do it all the time. Or the subsequent line of cases. Well... I mean, how do you explain Garrow or Armstead? I think what Garrow and Armstead were trying to do, essentially, what I suggested the Court should do, look at the... harmonize the cases by letting the old line govern, which includes a Supreme Court case and an en banc case. And if it's part of the offense, preponderance is sufficient. And if it's not, then other factors need to be weighed. The totality of the circumstances. That would harmonize. Now, I recognize Jordan didn't do that. It just said it weighed it heavily, and then it ended up letting... She actually included the Philpott line as one of the tests, didn't it? And it recognized... it incorporated that concept into one of the tests. Oh, I'm sorry. You know, I've been saying, Jordan, and I really was thinking of Riley, the two cases that fall kind of out of the line are Zulp, which we've said is based on a government concession. There's no holding in the case about standard. The Court just says the government concedes the clerk convict is applicable. Riley is the one where they weighed the extent of the conspiracy heavily. It ended up being dispositive, but they didn't treat it as dispositive. And that was what was troubling about that. Jordan, however, is... They... Give me just one second here. Jordan required clear and convincing for uncharged and uncharged conduct and conduct on which they had no verdict because the charge had been dismissed. So to me, that falls straight into line with the holdings of the earlier cases. I'm sorry. Okay. Okay. Unless the Court has questions, I thank you. No, we've taken you over, too. Would you like a couple of minutes? I would love a couple of minutes, Your Honor. Let's make sure you get a chance to respond. Okay. Let me start with loss causation, and I'd love to respond to any questions the Court has, obviously, on standard of proof. I wish I could speak with greater clarity on this, but I guess the bottom line, I think, what the Court has to do here, is at the very least vacate the sentence based on the securities fraud loss because the method that the district court used here was not permissible. Now, there might be other theories of loss of... Describe for me, as you see it, the method used by the district court. The method used by the district court was not the method that Your Honor was talking about in terms of focusing on an IPO being different. It was not the method that Judge Clipton was focused on in terms of the shareholders... Don't tell me what it was. Tell me what it was in your view. What it was was if the fraud had been disclosed to the market, how much would the stock have dropped? And the way I'm going to figure that out, because I concede that, and there's no dispute here, the fraud never was revealed to the market. The way I'm going to figure that out is look at other companies that are totally different, different industries, different time periods, different economic cycles. I'm going to look at how much the stock price of those companies dropped when the fraud in those cases was revealed. Totally different frauds have nothing to do with the fraud that's at issue here. Let me ask you this. Put into one side the detail of how you get there. Let me propose the following as a measure of loss in this case in the abstract, and then you can say whether you agree with it or disagree with it. The stock is sold by the company. Part of the sale representation includes things that are not true. If the stock had been sold based only on true statements, the stock would have sold for less. Correct. Is an acceptable measurement of loss the difference between what the stock would have sold for had the truth been known at the time of sale compared to what the stock actually sold for based upon the fraudulent misrepresentations? Is that an acceptable measure of loss? Maybe of intended loss? Yes. If you could show that the defendant in your... You had an earlier hypo with the government. Let's say that I'm selling you a share just in a private transaction that I know to be worth $5, and I'm selling it to you for $10. Transaction goes through. I think you could prove that the defendant intended you to suffer a loss of $5, whether you did or not. Let's say you were such a... I'm not so much interested in intent at the moment. I'm interested in amount of loss, not intent yet. You can talk about intent later. Okay. And all I'm saying is that there's not going to be an actual loss to you in that hypo if you are subsequently able to sell the share for $10. That's just a fact. You haven't suffered any actual loss. Now, you may be right that I intended you to suffer a $5 loss, and that might be an alternative theory for the government to prove loss. But on these facts here, the stock was sold at $5.50. The stock price did decline, but it declined for other reasons totally independent of the fraud. I understand. Okay. The only other point I guess I would make, Your Honor, is that I think what you have to say here is that there may be other alternative methods that the government can use to establish loss on remand. But the method that the district court used, looking at this other set of four companies where the fraud was revealed, taking the average of the stock price that dropped there and then transposing it over to this case on totally different facts, that's not a proper way of calculating. We've talked loss to death. Do you want to respond briefly on this standard of proof issue? Just one point. I think the two lines of cases that we laid out in our briefs clearly do conflict. I think Your Honor should follow the line of cases that we're advocating. But if you wanted to reconcile them, I think the way to reconcile them is to do this, is to say that when Harris and Philpott in those cases talk about offensive conviction, what they have to mean post-Booker is offensive conviction is limited to those facts that either were found by the jury or admitted by the defendant in a guilty plea. If you read, if you construe offensive conviction in that context, all of the cases are totally reconcilable. And if you do that on our facts, there was no jury finding of loss. That's undisputed. We know that because the first time the district court sentenced Mr. Berger, the defense level was only six. This was pre-Booker. If you do that in our case, you have to establish loss in a clear and convincing evidence. I don't understand that. Clearly there's a conviction for conspiracy. And we know now that Booker doesn't require the jury to find the facts of the actual loss or the amount of loss. So why does this become clear and convincing? Because there has been no prior determination by a fact finder, either defendant admission or the jury verdict itself, where the particular fact that's being used to elevate the sentence was found under a sufficiently reliable standard of proof. If you suggest every drug bust, you're going to have to demonstrate quantity by clear and convincing evidence. Is that what you think the law says? Does the law say that? Yes. If the impact is significant enough, and we submit it's greater than four levels or doubling the sentencing range, if the additional quantities that the jury never found when it rendered its guilty verdict were never admitted by the defendant in the guilty plea, if that's going to be used to bump up somebody's sentence that significantly, yes, it always has to be found under clear and convincing evidence. And that's where with cases like last year, Armstead and Garrow? No. And I'm saying that the two lines of cases conflict. I think that's why we suggest that either you should take the case on bonk and resolve that conflict, or I think the way to reconcile them is to say that when we're talking about offensive conviction, including a conspiracy conviction, what you have to look to are what facts did the jury implicitly find, and there will be situations, Your Honor, where the jury does implicitly find in the course of rendering a conspiracy conviction that the conspiracy consisted of 10 kilos, because that was what the evidence was, and in order for the jury to convict it would have had to have believed that. But when you're in a situation where the jury's just merely rendering the verdict doesn't tell you anything about the total quantity of drugs involved, there's been no prior determination of sufficient reliability to bump somebody's sentence up by years and years and years, then yes, I would submit that the court's case is direct, that clear and convincing evidence has to be proved.  Thank you, Your Honor. Thank you both sides for quite helpful arguments in a fairly complex matter. The case of Richard Berger is now submitted for decision. We now have the, I'll call it the companion case of the United States v. Cornella.
judges: Fletcher W. , Fisher, Smith M.